UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POP CINEMA, LLC,

          Plaintiff,

    v.

FIRST LOOK HOME
ENTERTAINMENT, INC.,

          Defendant.

CIVIL ACTION NO.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Pop Cinema, LLC ("Pop Cinema"), by and through its attorneys, Pashman Stein, A Professional Corporation, by way of complaint against defendant First Look Home Entertainment, Inc. ("First Look"), says:

## Nature of the Action

1.  This is an action alleging breach of an exclusive distribution contract, breach of duty of good faith and fair dealing, fraudulent inducement and promissory estoppel against First Look.

## Jurisdiction and Venue

2.  The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

3.  Pop Cinema and First Look are citizens of different states and the matter in controversy vastly exceeds $75,000.

4.  The Southern District of New York, Civil Division is a proper venue for this action, as the contract between the parties provides that any suits involving the contract be

venued in either the Southern District of New York or the Supreme Court of New York, New York County.

## Parties

5.  Pop Cinema is a New Jersey Limited Liability Company with its principal place of business located at 10 Park Place, Building 6A, 2nd Floor, Butler, New Jersey.

6.  First Look is, upon information and belief, a California corporation authorized to conduct business in the State of New York.  First Look's principal place of business is located at 2000 Avenue of the Stars, Suite 410, Century City, California.

## Overview

7.  As will be set forth more fully in this Complaint, Pop Cinema and First Look entered into a contract whereby First Look agreed to be the exclusive distributor for movies produced by Pop Cinema.  First Look has repeatedly breached the contract and failed to market or sell Pop Cinema's movies in good faith by, among other things:

- Failed to review or familiarize itself with Pop Cinema's movies before attempting to sell them to retailers.

- Failed to effectively market Pop Cinema's movies because it did not want to be associated with Pop Cinema's product.

- Created an incentive program for its sales force that rewarded them for selling First Look's proprietary movies instead of Pop Cinema's movies.

- Failed to sell Pop Cinema's movies to Transworld/FYE, the largest retail purchaser of Pop Cinema's movies, while, at the same time selling its own proprietary movies to Transworld/FYE.

- Failed to place Pop Cinema's movies with Blockbuster, reserving the four slots in its output deal for its own proprietary movies.

8. As a result, Pop Cinema has suffered significant damages, including but not limited to, lost monies on invoices that First Look has failed to pay, lost profits for the movies that First Look did not reasonably market or sell and lost profits for movies that Pop Cinema was unable to produce or release because of First Look's deficient performance. In fact, First Look's actions have caused such irreparable damage Pop Cinema that this once successful business may not survive.

## Facts Common to All Claims for Relief

A.  **Relationship with Ventura Distribution, Inc.**

9. Pop Cinema is and has been engaged in the business of producing straight-to-video horror and erotica movies since 1994. When Pop Cinema first began its business, national retail chains that carried movies would not deal directly with independent producers like Pop Cinema. Instead, they preferred to deal with national movie distributors.

10. At that time, in the mid-1990's, Ventura Distribution, Inc. ("VDI") was engaged in the business of distributing independent and straight-to-video movies. Upon

3

information and belief, Larry Hayes, president of VDI, received several telephone calls from national retail chains inquiring whether they carried (or could carry) Pop Cinema's movies.

11. As a result, Larry Hayes contacted Pop Cinema to inquire whether VDI could distribute Pop Cinema's movies. In 1996, Pop Cinema entered into a contract that made VDI the exclusive distributor of Pop Cinema's movies. The contract contemplated two avenues of distribution (1) to retail outlets, such as Transworld/FYE, Best Buy, Borders, Hastings and Netflix, for resale to the public and (2) to rental outlets such as Blockbuster and Hollywood Video.

12. With respect to the videos designated for resale to the public, which was the main focus of VDI's distribution efforts and primary source of revenue for Pop Cinema, VDI purchased videos from Pop Cinema and then resold them to retail outlets. Pop Cinema would make a profit on each video it sold to VDI. With respect to the videos designated for rental, VDI would facilitate the placement of complimentary copies of Pop Cinema's movies into rental outlets and Pop Cinema would receive a percentage of the rental revenue generated by its movies. (this business model is referred to as "revenue share.")

13. Pop Cinema was satisfied with its relationship with VDI and its business thrived. In fact, Pop Cinema's business

4

grew to the point where it generated yearly revenues in excess of $2 million.

14. However, by 2005, VDI was experiencing financial difficulties. VDI began making payments to Pop Cinema that were 30-60 days late and by January 2006 stopped making payments entirely.

15. In or about January 2006, VDI filed for bankruptcy. At that time, VDI owed Pop Cinema approximately $160,000.

B.    **First Look's Purchase of VDI's Assets**

16. At the time VDI declared bankruptcy, First Look was engaged in movie distribution, but primarily focused on distribution to rental outlets, as compared to VDI, which primarily focused on resale to retail outlets. Upon information and belief, First Look sought to purchase VDI's assets so that it could become a one-stop shop for movie distribution -- both to rental and retail outlets.

17. One of VDI's assets was a computer/software system known as the Vendor Managed Inventory system ("VMI"). This system allows national retail chains, specifically Best Buy, to track and order movies directly from VDI. In fact, Best Buy did not purchase movies directly from any distributor that did not use VMI.

18. As Best Buy is one of the largest retail movie chains in the country, the ability to sell to it is critical to any

distribution company. Consequently, First Look, which did not possess VMI, purchased VDI's assets through bankruptcy in March 2005. Not only did the purchase provide First Look access to VMI, but First Look also hired and/or retained many of VDI's employees, including Larry Hayes.

19. At the time First Look purchased VDI's assets, Pop Cinema had built a brand name for its movies and could have signed a contract with any one of a number of national distributors. In fact, it had already begun investigating and speaking with other potential distributors. However, Larry Hayes, now a First Look employee, set out to convince Pop Cinema to retain First Look as its exclusive distributor.

20. First Look advised Pop Cinema that it had an output deal with Blockbuster, whereby each month Blockbuster would accept a certain number of First Look movies as videos for rent, and promised Pop Cinema that it would be able to place Pop Cinema's movies in Blockbuster. This output deal was far superior to the relationship that VDI had with Blockbuster, and Pop Cinema was lead to believe that more of its movies would be on Blockbuster's shelves, which would not only increase Pop Cinema's rental revenue, but enhance its name recognition leading to additional sales as well.

21. Additionally, if Pop Cinema signed on with First Look, it would resolve one immediate problem regarding several

thousand Pop Cinema videos in VDI's inventory, which were now in the possession of First Look. If Pop Cinema signed with another distributor, those videos, which were assets tied up in the bankruptcy proceeding, could not be recovered (at least not immediately) to provide to a new distributor to sell. As the vast majority of video sales occur within the first six months a movie is released, if Pop Cinema attempted to recover its inventory from VDI, the value of the movies would have been significantly reduced by the time Pop Cinema actually received possession. However, as First Look was purchasing VDI's assets, Pop Cinema's inventory could easily be transferred to First Look and sold immediately.

22. Finally, as First Look was purchasing VDI's assets and retaining a large portion of its sales force, First Look promised, and Pop Cinema reasonably believed, that First Look would be able to continue selling Pop Cinema's movies to all of the retailers that Pop Cinema traditionally sold to through VDI.

23. As a result, in or around March 2006, Pop Cinema verbally agreed to distribute its movies through First Look.

24. First Look's promises were further enforced by a meeting that occurred in or around May 2006 with First Look representatives Henry Winterstern, William Bromley and Larry Hayes. At that meeting Winterstern promised that he could

force Blockbuster to take 20,000 units of Pop Cinema's next release, a movie entitled "Shock-o-rama." Based upon Winterstern's direct representations and the close relationship he claimed to possess with Blockbuster, Pop Cinema reasonably assumed that this meant that for any given title, Pop Cinema could expect to receive rental revenues on 20,000 units in circulation in addition to the net proceeds from sales of the film. Winterstern also said that he would be able to grow Pop Cinema's business and that he could get such noteworthy celebrities as Pamela Anderson and Paula Abdul to appear in upcoming Pop Cinema movies. Needless to say, none of these promises were realized.

## C.    The Contract Between Pop Cinema and First Look

25. Although Pop Cinema verbally agreed to use First Look as its exclusive distributor in March 2006, the parties did not actually enter into a written agreement until February 2007.

26. However, as a consequence of First Look's misrepresentations, Pop Cinema was coerced to immediately begin shipping films to First Look in Spring 2006 (without the benefit of a written contract) due to First Look's frenzied and repeated requests for films to "rush deliver" to Best Buy. First Look became concerned that, should there was a delay in providing Pop Cinema films to Best Buy while First Look was purchasing and assuming control of VDI's assets (including

VMI), Best Buy would stop carrying the Pop Cinema films that it could not readily obtain.

27. As a result, First Look rush ordered massive quantities of Pop Cinema films to sell to Best Buy before Best Buy decided to stop carrying them. Despite the inconvenience, Pop Cinema complied with First Look's requests and produced and shipped the requested quantities to First Look in a timely manner.

28. However, First Look apparently never communicated with Best Buy before placing the orders. First Look never advised Best Buy of the orders nor did it attempt to coordinate delivery of the films. If it had, First Look would have learned that Best Buy already had stopped carrying the Pop Cinema films by the time those films were delivered to First Look. As a result, all of the movies that Pop Cinema "rush delivered" wound up sitting in First Look's warehouse, unsold.

29. In fact, First Look did not even advise Pop Cinema about the situation after the fact. Rather, Pop Cinema learned about it several months later when it was performing a reconciliation of its sales to Best Buy. Moreover, as will be discussed below in further detail, First Look would later attempt to return all of those films to Pop Cinema, at no cost to it.

9

30. Throughout 2006, Pop Cinema and First Look were engaged in negotiations to formalize their relationship. First Look continuously delayed preparing and then executing the contract. For most of 2006, First Look vacillated between whether it would purchase Pop Cinema's videos and resell them to retailers or whether it would take the videos on consignment. First Look eventually decided to purchase the videos -- the same arrangement that Pop Cinema had with VDI.

31. The contract was "made and entered into as of this 28th day of July 2006 and effective as of the 27th day of March 2006" even though it was signed by Pop Cinema on January 29, 2007 and by First Look on February 13, 2007. The contract term was for 3 years (through July 27, 2009) and automatically renewed for successive two-year periods unless either party elected to cancel by providing 90-day written notice to the other party.

32. The contract provided First Look the exclusive right to promote, market and sell the videos produced by Pop Cinema. Pursuant to the agreement, First Look issued purchase orders to Pop Cinema, who furnished the requested videos to First Look within 10 days. First Look was required to pay the net proceeds (purchase price less fees incurred by First Look in distributing the videos) to Pop Cinema within 90 days after First Look received the videos.

33. According to ¶2.5 of the contract:

First Look shall consult with Pop prior to placing any purchase orders to supply the programs to its customers in order to accurately estimate the amount of each program it should supply and shall make a good faith effort not to order more finished Goods Units of a Program than can reasonably be expected to be sold. (emphasis added.)

Although First Look expressly made "no warranty or representation as to the amount of monies which may be earned by Pop" under this agreement, it agreed to "use commercially reasonable efforts to sell" the videos.

34. Pursuant to the contract, First Look had the right to return any Pop Cinema movies in its inventory to Pop Cinema, for full credit, "after First Look has used all commercially reasonable efforts to distribute the Overstock and/or returned Units to other retail customers before attempting to return the units to Pop Cinema as describe hereunder." However, for each calendar quarter, these returns were limited to 25% of the current on-hand inventory held by First Look. The purpose of this clause was to prevent a massive amount of returns all at once that could stop Pop Cinema's cash flow for a given quarter. Moreover, the contract expressly stated that any videos First Look obtained through its purchase of VDI's assets could not be returned to Pop Cinema.

35. Not only did First Look have the exclusive right to sell Pop Cinema videos to retailers, but is also had the

exclusive right to distribute Pop Cinema's movies to rental outlets (i.e., Blockbuster, Hollywood Video). Pursuant to the contract, Pop Cinema provided videos to First Look at no charge and First Look placed the videos with rental outlets. The rental outlets paid a fixed percentage of their rental revenues to First Look who was required to remit 77.5% of the money it received to Pop Cinema. (First Look was authorized to retain the remaining 22.5%).

36. First Look was required to report to Pop Cinema on a monthly basis regarding activities for rental videos and was required to pay Pop Cinema its share of the rental revenue within 30 days of each report.

D.   **First Look's Performance Under the Contract**

     i.   **March through September 2006**

37. Almost as soon as Pop Cinema began working with First Look, First Look failed to properly distribute Pop Cinema's movies, and certainly did not do so in the manner and scope that had been promised. Not only was First Look not living up to its promises regarding rental placement with Blockbuster, but it demonstrated little or no interest in promoting Pop Cinema's movies.

38. Apparently, First Look experienced serious problems integrating the VDI and First Look sales forces. As one consequence, there was confusion among First Look employees

concerning who was responsible for distributing Pop Cinema's movies to the various retailers and/or regions.

39. For example, but not by limitation, at a July 2006 trade show in Las Vegas, Pop Cinema employee Paige Davis had a conversation with a First Look employee Lisa, who was responsible for distributing Pop Cinema's movies. Lisa advised Paige that she was not sure what retailers were her responsibility.

40. This information was extremely disconcerting because Pop Cinema's first two new releases through First Look -- "Shock-o-rama" and "Kinky Kong" -- were scheduled to be released on September 5, 2006.

41. It is crucial that retail and rental outlets have copies of new movie releases on their shelves on the release date. Otherwise, customers looking for these movies will not be able to find them. Once a customer looks for and is unable to find a new release, that customer is unlikely to look for or purchase it at a later date. Therefore, Pop Cinema provided First Look with copies of its movies and promotional materials three months before a movie's release date. This should have enabled First Look to become familiar with the movies, market them to retail and rental outlets and fulfill any orders so that they will be available to the public on the release dates.

42.  As Lisa did not know which retailers she was responsible for selling to less than two months before the release date for "Shock-o-rama" and "Kinky Kong" she was unable to distribute the movies to her targeted retail outlets in time for the movies to be available on the release date.

43.  Moreover, upon information and belief, Lisa described "Shock-o-rama" as "pornographic" during a First Look sales meeting.  "Pornographic" movies usually carry a Motion Picture Association of America ("MPAA") rating of "NC-17" (no one under 17 is admitted) or are unrated.  However, "Shock-o-rama" was not "pornographic" as it actually had an MPAA of "R" (which means that any person under 17 must be accompanied by an adult).  This designation is significant because many retailers refuse to carry movies rated NC-17 or movies that are not rated.  If Lisa was unaware of the MPAA rating for Pop Cinema's movies, she would be unable to effectively market or sell the movies.

44.  Additionally, at that same July 2006 Las Vegas trade show, Tony Venturo, the First Look employee in charge of marketing and selling Pop Cinema's movies to Hollywood Video, told Paige Davis that he had not seen any promotional materials for "Shock-o-rama" and, in fact, was not aware of the movie.  Again, if Tony was unaware of the existence of "Shock-o-rama" less than two months before its release date, he could not

market or sell the movie to Hollywood Video in time for it to be available at Hollywood Video on the release date.

45. As could be expected with the unreasonably poor level of service being provided by the First Look sales force, both "Kinky Kong" and "Shock-o-rama" (and a third September 2006 release "Buxom Bombshell Collection") sold less than half of what similar Pop Cinema movies had been selling through VDI only one year earlier. Moreover, neither "Kinky Kong" nor "Shock-o-rama" were placed in Blockbuster or any other rental outlet and generated zero rental revenue.

**ii.  October 2006 through January 2007**

46. As a result of the abysmal performance of "Kinky Kong," "Shock-o-rama," and "Buxom Bombshell Collection," First Look representatives William Bromley (president of home media), Michael Katchman (vice president of sales), Marty Datillo and Marie O'Reilly (sales executives) flew to Butler, New Jersey to meet with Pop Cinema and reassure it that First Look was capable of handling Pop Cinema's distribution needs. At that meeting, First Look acknowledged that were problems with its sales force and its performance in promoting "Kinky Kong," "Shock-o-rama," and "Buxom Bombshell Collection" and promised to reorganize the sales force in order to generate future sales.

47. At that same meeting, First Look also reiterated the benefits that would inure to Pop Cinema as a result of the output deal First Look had with Blockbuster. First Look confirmed that it had several "guaranteed" slots each month in which to place movies with Blockbuster and that Blockbuster, for all intents and purposes, had to accept these movies.

48. As First Look distributed movies for other production companies and even distributed its own proprietary movies, Pop Cinema asked if it should coordinate its release schedule with the other companies or First Look to ensure that it did not schedule a release date for a new movie when all of First Look's "guaranteed" Blockbuster slots were filled. First Look advised that it had more slots than it could fill, so there was no need for Pop Cinema to coordinate its release schedule.

49. As a result of the promises made by First Look at the October 2006 meeting, Pop Cinema decided to continue distributing its movies through First Look.

50. Unfortunately, none of the improvements promised by First Look materialized and the sales of the four October releases by Pop Cinema again generated about half the sales of similar movies Pop Cinema released through VDI just one year earlier. Although Pop Cinema historically released two movies every month, the abysmal sales caused Pop Cinema to cease

production on movies and it did not release any movies in November 2006, December 2006 or January 2007. Had Pop Cinema released any movies during this time, First Look's inability (or unwillingness) to effectively promote Pop Cinema's movies would have guaranteed that those movies would have generated less in revenue than they cost to produce.

51. Moreover, after learning more about First Look's operation, it became clear why its sales efforts were so poor -- it had no interest in promoting Pop Cinema's movies.

52. Every month the First Look employee responsible for a particular retailer would present movies from all of First Look's clients, including Pop Cinema, other production companies that retained First Look and those proprietary titles belonging to First Look. Upon information and belief, this would include 20 to 40 titles per month. Moreover, most of First Look's monthly face-to-face meetings with the retailers lasted no more than two hours. Obviously, there was not enough time during the meeting to discuss each film in detail. First Look's sales force could only highlight a few movies and had to rely on leaving promotional materials with the retailers for the remainder of the movies.

53. Upon information and belief, First Look's sale people received a commission for placing or selling First Look's proprietary titles. However, there was no such commission

17

offered for selling Pop Cinema's movies. This created an incentive to sell First Look's movies instead of Pop Cinema's, especially when retailers only purchase a set number of movies each month. Moreover, the significant time constraints in presenting 20 to 40 titles during a face-to-face meeting, lead First Look's sale force to highlight First Look's proprietary movies and simply leave Pop Cinema's promotional materials with the retailers.

54. Another reason for the horrendous performance of the movies distributed by First Look was that, unbeknownst to Pop Cinema, First Look and Transworld/FYE had a professional falling out and First Look stopped distributing to Transworld/FYE, which had been the single largest retail purchaser of Pop Cinema's movies prior to September 2006.

55. As Transworld/FYE was responsible for such a large percentage of Pop Cinema's sales, had Pop Cinema known that First Look would not sell to Transworld/FYE it would not have retained First Look to be its distributor.

56. However, First Look did not admit that a rift existed with Transworld/FYE until Pop Cinema confronted it about the lack of sales to its largest customer. First Look continuously promised to repair its relationship with Transworld/FYE and said that it expected to be distributing to Transworld/FYE

18

shortly.    However, First Look never sold any of Pop Cinema's movies to Transworld/FYE.

57. However, First Look apparently was willing to overlook its dispute with Transworld/FYE and to sell some of its propriety movies to Transworld/FYE. It simply would not make the same concessions for Pop Cinema's movies.

58. Moreover, not only did First Look fail to sell to Transworld/FYE but, for various titles (and without any explanation), First Look failed to sell movies to many of Pop Cinema's previous retail customers such as Borders, TLA, Hastings, AAFES, EURPAC, Baker & Taylor, and Blockbuster.com.

59. When Pop Cinema asked First Look why there were no sales to these retailers that traditionally purchased its product, there was no response. No one at First Look could (or would) say what steps were being taken to sell to these retailers or what type of feedback First Look was getting from the retailers about Pop Cinema's movies. Without any idea what the retailers wanted or why they were no longer purchasing Pop Cinema's products, Pop Cinema was completely in the dark as to how to manage its business. First Look provided absolutely no assistance to Pop Cinema that would enable it to make changes to its product or release dates in order to resuscitate sales.

**iii. January 2007 through June 2007**

60. When Pop Cinema stopped releasing movies in late-2006, First Look again acknowledged their deficient performance and continued promising to improve. After three months without releasing a new movie, Pop Cinema attempted to release another movie, "Chainsaw Sally." Unfortunately for Pop Cinema, First Look's performance did not improve.

61. Pop Cinema scheduled a February 27, 2007 release date for "Chainsaw Sally" upon First Look's assurance that Blockbuster would accept the movie on that date. As a result, Pop Cinema announced the release date and incurred expenses marketing and promoting the movie. Only a few weeks before the release date, First Look advised that Blockbuster would not accept the movie.

62. Pop Cinema was surprised to learn that Blockbuster could reject the movie after the promises made to Pop Cinema at the October 2007 meeting. Even more disturbing was that First Look failed to advise Pop Cinema about the rejection until after Pop Cinema announced the date and incurred expenses promoting the release, notwithstanding that First Look knew about the rejection weeks earlier.

63. As Pop Cinema scheduled a release date and promoted "Chainsaw Sally" in reliance on First Look's assurance that Blockbuster would carry it, many potential customers looking

for the movie would not be able to find it on the release date -- decimating sales and rental revenue for "Chainsaw Sally."

64. At the same time, First Look advised Pop Cinema that it would not be able to place any new movies with Blockbuster for the next seven months because its output deal only included four monthly slots and all of those slots were filled with First Look proprietary movies.

65. Moreover, by this time (February-March 2007), First Look entirely lost interest in promoting any movies from Pop Cinema and even seemed to distance itself from Pop Cinema's products.

66. In February 2007, Nu Image, Inc. purchased First Look. Nu Image is a production studio that makes high-budget, blockbuster movies. Some of its newer releases involve movie stars such as Robert De Niro, Al Pacino, Samuel Jackson, Jessica Simpson and Sylvester Stallone. These movies target any entirely different audience than the one that purchases or rents lower-budget independent films from producers like Pop Cinema.

67. It became apparent to Pop Cinema that First Look no longer was interested in doing business with Pop Cinema as its niche products did not fit within First Look's new business plan. First Look was afraid that its high-budget pictures would be tarnished by any association with Pop Cinema and

sought to distance itself, as much as possible, from Pop Cinema's movies.

68. First Look's disdain for Pop Cinema's movies can been seen in comments from Tony Ventura, who called Pop Cinema's Product "garbage," and Michael Katchman, First Look's Vice President of Sales, who said Pop Cinema's movies were "all $9.00 product" because (in his opinion) the quality of the movies was not sufficient enough to be sold at a suggested retail price competitive with other movies.

69. Moreover, Larry Hayes told Pop Cinema that First Look was moving in a new direction and was no longer interested in distributing Pop Cinema's movies.

70. Following this change in attitude, not only did problems exist with the marketing, communication and placement of Pop Cinema's movies, but First Look started paying its invoices late. By April 2007, First Look owed Pop Cinema $146,500 on outstanding invoices, the majority of which were past due.

71. Additionally, First Look was not complying with its contractual obligations for the movies it did place in rental outlets. First Look placed Pop Cinema's movie "Sinful" in Blockbuster in October 2006 and "SSI" in June 2007. Additionally, First Look placed Pop Cinema's movie "Chainsaw

22

Sally" with rental outlet Hollywood Video in January 2007 and "Skin Crawl" with rental outlet Rentrak in April 2007.

72. First look was contractually obligated to deliver monthly rental reports and Pop Cinema's share of the rental revenue within 30 days of each report. Simply put, First Look did not comply with its obligations. Pop Cinema has not received any reports for "Skin Crawl" or "SSI" and only received sporadic reports for "Sinful" and "Chainsaw Sally." Moreover, the rental reports that First Look did provide were never timely -- Pop Cinema had to plead and beg for each rental report it received.

73. Additionally, First Look cannot deduct from the revenue share the expenses it incurs in distributing Pop Cinema's films to rental outlets. Nevertheless, the rental reports Pop Cinema received contained numerous errors including phantom "deductions" and "corrections" for errors that allegedly occurred in previous reports. The "deductions" and "corrections" were always in First Look's favor and conveniently offset any revenues that were due to Pop Cinema for its share of the rental revenue.

74. Due to the vague and inconsistent manner in which First Look prepared its rental reports (when it bothered to do so) Pop Cinema could not feel confident that First Look was accurately reporting the rental revenues -- notwithstanding the

phantom "credits" and "deductions" -- generated by Pop Cinema's films.

75. After Pop Cinema sent several letters demanding payment for the sales and rental revenue owed to it, First Look responded by stating that it had $176,000 of "returns" in its inventory and used that figure to offset the entire amount owed to Pop Cinema. This was in complete contravention of the contract, which stated that only 25% of First Look's inventory could be offset per quarter. Moreover, the alleged "returns" included movies that First Look obtained through its purchase of VDI's assets, nothwithstanding that the contract expressly stated that these videos could not be returned to Pop Cinema. Additionally, the "returns" also included all of the movies that First Look expressly rush ordered for Best Buy that it could not sell because Best Buy stopped carrying those movies.

76. Since April 2007, First Look has not made any payments to Pop Cinema, it has not purchased any movies and it has kept its inventory of Pop Cinema videos. Its actions essentially terminated Pop Cinema's cash flow and forced Pop Cinema to use a line of credit to keep its business going. Pop Cinema, who usually released two movies a month, did not release any movies from May 2007 to October 2007. It was forced to close its production studios, lay off employees and freeze the salaries of those who remained.

77. Although Pop Cinema has signed on with a new distributor, the damage that First Look inflicted on the Pop Cinema brand name has proven irreversible. Pop Cinema has not been able to recover the sales it lost while First Look was its exclusive distributor. In fact, Pop Cinema's once prosperous business is in danger of closing.

78. On April 10, 2007 Pop Cinema sent an email to First Look identifying several breaches of the contract. On May 23, 2007, after First Look failed to cure the breaches, Pop Cinema advised First Look that it was terminating the agreement effective June 10, 2007.

79. As there has been absolutely no communication from First Look, Pop Cinema has no idea if First Look is selling or even attempting to sell any of the Pop Cinema inventory it retained. Moreover, as First Look has stopped providing any rental reports, Pop Cinema does not know what is owed to it for its share of the rental revenue.

## FIRST COUNT
### (BREACH OF CONTRACT)

80. Plaintiff incorporates by reference paragraphs 1 to 79 of this Complaint as if set forth in full herein.

81. Pop Cinema entered into a contract with First Look whereby First Look would be the exclusive distributor of Pop Cinema's movies.

## A.   As to payments for invoices

82.   Pursuant to the contract, First Look issued purchase orders to Pop Cinema, who supplied the requested videos to First Look. First Look was required to pay the net proceeds (purchase price less fees incurred by First Look in distributing the videos) to Pop Cinema within 90 days after it received the videos.

83.   Beginning in late 2006-early 2007, First Look stopped making payments in a timely fashion for the videos supplied by Pop Cinema.

84.   By April 2007, First Look ceased making any payments on outstanding invoices for videos supplied by Pop Cinema.

85.   To date, all outstanding invoices -- which total approximately $146,500 -- are overdue.

86.   First Look breached its contractual obligations to Pop Cinema by failing to pay Pop Cinema for the videos supplied by Pop Cinema.

## B.   As to Rental Reports and Payments

87.   Pursuant to the contract, First Look was required to report to Pop Cinema on a monthly basis the sales activities for the rentals and was required to pay Pop Cinema its share of the revenue royalty within 30 days of each report.

88.   First Look placed Pop Cinema's movie "Sinful" in Blockbuster in October 2006 and "SSI" in June 2007.

Additionally, First Look placed Pop Cinema's movie "Chainsaw Sally" with rental outlet Hollywood Video in January 2001 and "Skin Crawl" with rental outlet Rentrak in April 2007.

89. Pop Cinema has not received any reports for "Skin Crawl" or "SSI" and only received sporadic reports for "Sinful" and "Chainsaw Sally." Moreover, the rental reports that First Look did provide were never timely -- Pop Cinema had to plead and beg for each rental report it received.

90. Moreover, the rental reports and revenues are distinct from the sales reports and revenues in that First Look cannot deduct its expenses from the revenue share due to Pop Cinema. Nevertheless, the rental reports Pop Cinema received contained numerous errors including phantom "deductions" and "corrections" for errors that allegedly occurred in previous reports. The "deductions" and "corrections" were always in First Look's favor and conveniently offset any revenues that were due to Pop Cinema for its share of the rental revenue.

91. First Look's failure to provide Pop Cinema with the requisite rental reports, the impermissible "deductions" and "corrections" it made to Pop Cinema's share of the rental revenue and its failure to provide Pop Cinema's share of the rental revenue constitute breaches the contract.

C.   **Failure to use Commercially Reasonable Efforts to Promote Pop Cinema's Movies**

92.   Several clauses in the contract between Pop Cinema and First Look required First Look to use "good faith" or "commercially reasonable" efforts to order and sell Pop Cinema's movies.

93.   According to ¶2.5 of the contract:

> First Look shall consult with Pop prior to placing any purchase orders to supply the programs to its customers in order to accurately estimate the amount of each program it should supply and <u>shall make a good faith effort not to order more finished Goods Units of a Program than can reasonably be expected to be sold</u>. (emphasis added.)

94.   In ¶2.7 of the contract, First Look agreed to use "commercially reasonable efforts" to sell Pop Cinema's films.

95.   Additionally, pursuant to ¶9.2 of the contract, First Look has the right to return any movies to Pop Cinema, for full credit only "after First Look has used all commercially reasonable efforts to distribute the Overstock and/or returned Units to other retail customers before attempting to return the units to Pop Cinema as described hereunder."

96.   Simply put, First Look did not use "good faith" in ordering Pop Cinema's movies and failed to use commercially reasonable efforts to sell them.

97.   First Look did not consult with Pop Cinema before placing orders and provided absolutely no feedback to Pop

28

Cinema regarding its sales efforts or retailer reaction to the movies. As a result, if First Look made a mistake (such as the one with Best Buy) Pop Cinema was unable to catch the mistake. Mistakes in inventory and ordering are rarely more than a temporary inconvenience for the distributor; however, if serious enough, they can put a company like Pop Cinema out of business. Moreover, without any feedback, Pop Cinema was unable to tailor its subsequent products to the tastes and preferences of the retailers.

98. First Look did not use commercially reasonable efforts to sell those Pop Cinema movies that it did order.

99. Commercially reasonable efforts by First Look would have included:

- Communicating with Pop Cinema regarding sales plans, retail and rental outlet comments on Pop Cinema's movies and regular updates on the status of new release orders.

- Actually speaking with retail and rental outlets about Pop Cinema's movies as well as providing promotional materials.

- Knowing the MPAA rating given to Pop Cinema's movies.

- Knowing the release dates for Pop Cinema's movies.

- Selling Pop Cinema's movies to Transworld/FYE.

- Having a commission system where First Look's proprietary movies were treated in the same manner as Pop Cinema's movies.

- Placing Pop Cinema's movies in the output deal with Blockbuster.

100. First Look failed to use commercially reasonable efforts to sell Pop Cinema's movies in that:

- First Look employed a commission system that provided an incentive to its employees to sell First Look's proprietary movies instead of Pop Cinema's movies.

- First Look sales people were unaware of certain movies being released by Pop Cinema -- such as "Shock-o-rama" -- less than two months before their release date.

- First Look sales people were unaware of the MPAA ratings for certain Pop Cinema movies.

- First Look sales people were not aware which retailers they were responsible for selling to.

- First Look sales people provided absolutely no feedback -- and in many instances simply failed to return phone calls -- regarding their sales efforts, retailer feedback or retailer orders.

- First Look failed to place movies with Blockbuster, using the four monthly slots in its output deal for its own proprietary movies.

- First Look refused to sell Pop Cinema's movies to Transworld/FYE -- the largest single retail purchaser of Pop Cinema's films -- although it was willing to sell its own proprietary movies to Transworld/FYE.

- First Look generally failed to promote Pop Cinema's movies to retailers because it did not want to be associated with Pop Cinema's product.

101. As a result of First Look's breach of its contractual obligations to both order Pop Cinema's videos in good faith and

use commercially reasonable efforts to sell those videos, Pop Cinema has been greatly damaged.

102. The movies that Pop Cinema released through First Look -- 12 movies in total -- all sold significantly fewer videos (nearly half) than similar movies released through VDI only one year earlier. The lack of sales revenue is directly attributable to First Look's failure to use commercially reasonable efforts to sell Pop Cinema's videos.

103. Additionally, based upon First Look's actions as described above, First Look placed significantly fewer copies of Pop Cinema's movies with rental chains than similar movies released through VDI only one year earlier. The lack of rental revenue is directly attributable to First Look's failure to use commercially reasonable efforts to promote Pop Cinema's videos.

104. Moreover, Pop Cinema lost profits because it was unable to release movies during November 2006 through January 2007 and May through June 2007 due to First Look's abysmal sales efforts. Pop Cinema historically released two titles a month. However, releasing any movies through First Look would have guaranteed a loss on those movies because First Look was incapable of or refused to use commercially reasonable efforts to sell Pop Cinema's movies. Pop Cinema's lost profit on movies that it could not release during these months is

31

directly attributable to First Look's failure to use commercially reasonable efforts to promote Pop Cinema's movies.

## SECOND COUNT

### (Breach of Good Faith and Fair Dealing)

105. Plaintiff incorporates by reference paragraphs 1 to 104 of this Complaint as if set forth in full herein.

106. Inherent in every contract is a duty of good faith and fair dealing that requires the contracting parties to not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

107. This duty is especially important when dealing with an exclusive distribution agreement, such as the one between Pop Cinema and First Look.

108. First Look breached this duty by failing to promote and sell Pop Cinema's movies, in that it:

- Failed to communicate with Pop Cinema regarding order quantities, sales efforts, retailers' reactions and whether sales efforts were successful.

- Failed to review or familiarize itself with Pop Cinema's movies before attempting to sell them to retailers.

- Failed to effectively market Pop Cinema's movies because it did not want to be associated with Pop Cinema's product.

- Created an incentive program for its sales force that rewarded them for selling First Look's proprietary movies instead of Pop Cinema's movies.

- Failed to sell Pop Cinema's movies to Transworld/FYE, the largest retail purchaser of Pop Cinema's movies, while, at the same time selling its own proprietary movies to Transworld/FYE.

- Failed to place Pop Cinema's movies with Blockbuster, reserving the four slots in its output deal for its own proprietary movies.

109. Pop Cinema was damaged by the above actions in that the movies it released through First Look sold significantly fewer copies and were placed with rental outlets in significantly fewer numbers than similar movies it released through VDI just one year before. Moreover, Pop Cinema lost profits on movies it was unable to release during November 2006 through January 2007 and May through June 2007.

110. Additionally, First Look breached its duty of good faith and fair dealing by claiming that an inflated amount of "returns" existed and using them to offset monies it owed to Pop Cinema. As an initial matter, First Look asserted an offset against the full amount of returns it claimed to have when the contract expressly stated it could not offset more than 25% of the total returns on hand in any given quarter. Moreover, First Look's "returns" included videos First Look received through its purchase of VDI's assets, notwithstanding that the contract expressly stated that First Look could not return those to Pop Cinema. The "returns" also included all of the movies that First Look expressly rush ordered for Best

Buy that it could not sell because Best Buy stopped carrying those movies.

111. As First Look was Pop Cinema's exclusive distributor, its unauthorized actions (and inaction), as describe above, essentially terminated Pop Cinema's cash flow, preventing Pop Cinema from making new movies and severely hampering its business.

112. Moreover, Pop Cinema was damaged in that it had to utilize a line of credit (which it had not done in its prior 10 years of existence), upon which it had to pay interest, in order to keep its business alive while it had no incoming cash flow.

113. Finally, Pop Cinema's entire business may fail due to First Look's actions. Although Pop Cinema has signed on with a new distributor, the damage that First Look inflicted on the Pop Cinema brand name has proven irreversible. Pop Cinema has not been able to recover the sales it lost while First Look was its exclusive distributor and it may have to close its business.

## THIRD COUNT
### (Fraudulent Inducement)

114. Plaintiff incorporates by reference paragraphs 1 to 113 of this Complaint as if set forth in full herein.

115. Prior to agreeing to use First Look as its distributor, First Look promised Pop Cinema that it would be able to service and grow Pop Cinema's business.

116. Specifically, First Look advised Pop Cinema that it had an output deal with Blockbuster that would allow First Look to place Pop Cinema's movies with Blockbuster.

117. However, after agreeing to use First Look as its exclusive distributor, Pop Cinema learned that the output deal only included four slots per month and that those slots were essentially reserved for First Look's proprietary movies.

118. As a result, Pop Cinema's movies were not going to be part of the "output" deal that First Look touted while inducing Pop Cinema to enter into the distribution agreement.

119. Had Pop Cinema known that it would be frozen out of First Look's output deal, it would not have agreed to enter a distribution agreement with First Look.

120. Additionally, First Look promised Pop Cinema that it would be able to sell to all of the retailers that previously carried Pop Cinema's films.

121. However, at the time Pop Cinema agreed to work with First Look, First Look was involved in a business dispute with Transworld/FYE, the largest single retail purchaser of Pop Cinema's movies. Unbeknownst to Pop Cinema, First Look had stopped selling to Transworld/FYE as a result of the dispute.

35

122. First Look did not advise Pop Cinema of the dispute, and Pop Cinema did not learn of it, until Pop Cinema had agreed to use First Look and already scheduled release dates for its September 2006 releases.

123. Although First Look continuously advised Pop Cinema that it would reach an agreement with Transworld/FYE, none was reached and First Look sold no Pop Cinema movies to Transworld/FYE.

124. Had Pop Cinema known that First Look would refuse to sell Pop Cinema's movies to what had been the largest single purchaser of its movies, Pop Cinema would not have agreed to use First Look as its exclusive distributor.

125. As a result of the above fraudulent promises and inducements made by First Look, Pop Cinema entered into a contract with First Look and was damaged because of First Look's failure to place Pop Cinema's movies with Blockbuster or sell Pop Cinema's movies to Transworld/FYE.

## COUNT IV
### (Promissory Estoppel)

126. Plaintiff incorporates by reference paragraphs 1 to 125 of this Complaint as if set forth in full herein.

127. Both during initial negotiations and again during its October 2006 meeting, First Look promised to make Pop Cinema part of its output deal with Blockbuster.

128. First Look made those promises in order to become Pop Cinema's exclusive distributor and then, after it was distributing movies for Pop Cinema, to prevent Pop Cinema from leaving to find another distributor.

129. In reliance on those promises, Pop Cinema initially agreed to use First Look as its exclusive distributor and then continued to use First Look when it could have otherwise found a new distributor for its movies.

130. As a result, Pop Cinema was damaged because it was not made a part of the output deal and First Look could not place Pop Cinema's movies with rental outlets in the same numbers as VDI did on similar movies only one year earlier.

**WHEREFORE,** Plaintiff, Pop Cinema seeks judgment against Defendant First Look as follows:

First Count:

    a.  Compensatory damages;

    b.  pre-judgment interest; and

    c.  Such other and further relief as the Court deems equitable and just.

Second Count:

    a.  Compensatory damages;

    b.  Pre-judgment interest; and

    c.  such other and further relief as the Court deems equitable and just.

Third Count:

    a.   Compensatory damages;

    b.   Punitive damages; and

    c.   Such other and further relief as the Court deems equitable and just.

Fourth Count:

    a.   Compensatory damages; and

    b.   Such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury.

Respectfully submitted,
**PASHMAN STEIN**
A Professional Corporation

Dated:  April 15, 2008
        Hackensack, NJ

By: _____

**SEAN MACK (SM2016)**
**MICHAEL S. STEIN (MS3248)**
Court Plaza South
21 Main Street
Hackensack, NJ 07601
(201) 488-8200 (Telephone)
(201) 488-5556 (Fax)

Attorneys for Plaintiff,
**Pop Cinema, LLC**